IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALEXANDER OLIVER KARELIS | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  21-1672 |
| Commissioner of Social Security[1] | : | |

## MEMORANDUM AND ORDER

ELIZABETH T. HEY, U.S.M.J.                                          September  23, 2022

Alexander Oliver Karelis ("Plaintiff") seeks review of the Commissioner's

decision denying his application for disability insurance benefits ("DIB").  For the

reasons that follow, I conclude that the decision of the Administrative Law Judge

("ALJ") is supported by substantial evidence.

## I.     PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on February 12, 2019, alleging disability

beginning on September 1, 2016, as a result of bipolar disorder, post traumatic stress

disorder ("PTSD"), and hypothyroidism.  Tr. at 75, 77, 185-88, 225.[2]  Plaintiff's

application was denied initially, id. at 68-74, 87-90, and on reconsideration.  Id. at 76-82,

93-95.  Plaintiff requested a hearing before an ALJ, id. at 97, which took place on July

---

[1]Kilolo Kijakazi is currently the Acting Commissioner of Social Security, see https://www.ssa.gov/agency/commissioner/ (last visited Sept. 14, 2022), and should be substituted for Andrew Saul as the defendant in this action.  Fed. R. Civ. P. 25(d).  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]To be entitled to DIB, Plaintiff must establish that he became disabled on or before his date last insured, 20 C.F.R. § 404.131(b), which is September 30, 2018.  Tr. at 76.

21, 2020.  Id. at 29-66.  On August 5, 2020, the ALJ issued a decision concluding that

Plaintiff was not disabled prior to September 30, 2018, the expiration of his insured

status.  Id. at 17-24.  The Appeals Council denied Plaintiff's request for review on

February 8, 2021, id. at 1-3, making the ALJ's August 5, 2020 decision the final decision

of the Commissioner.  20 C.F.R. § 404.981.

Plaintiff commenced this action in federal court on April 8, 2021, Doc. 1, and the

matter is now fully briefed and ripe for review.  Docs. 10, 16, 18.[3]

## II.   <u>LEGAL STANDARDS</u>

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than twelve

months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process,

evaluating:

> 1.     Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.     If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities;
>
> 3.     If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;

---

[3]The parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See Standing Order, In RE:  Direct Assignment of Social Security Appeal Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018); Doc. 6.

      4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his past work; and

      5.      If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of his age, education, work experience, and RFC. See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

      The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999). Therefore, the issue in this case is whether substantial evidence supports the Commissioner's conclusion that Plaintiff is not disabled. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla." Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, __ U.S. __, 139 S. Ct. 1148, 1154 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting Consolidated Edison Co. v.

NLRB, 305 U.S. 197, 229 (1938)).  The court has plenary review of legal issues.

Schaudeck, 181 F.3d at 431.

## III.   DISCUSSION

The ALJ found that, through the date Plaintiff was last insured, the only severe impairment he had was depression/bipolar disorder, but that his impairments did not meet or equal any of the Listings.  Tr. at 19-20.  The ALJ found that, through the date last insured, Plaintiff could perform a full range of work at all exertional levels with the following nonexertional limitations:  perform detailed uninvolved work-related activities at the Specific Vocational Preparation ("SVP") 1-SVP 2 level, requiring occasional interaction with co-workers, less than occasional interaction with the public with few changes in a routine work setting; requiring an unskilled, low stress environment with no strict production/pace requirement which does not require stringent quotas or a fast pace; and can perform work without supervision (not requiring a supervisor to check on his work on a regular basis).  Id. at 21.  Based on this RFC assessment and the testimony of a vocational expert ("VE"), the ALJ concluded that Plaintiff could perform his past relevant work as a general clerk, and other jobs identified by the VE.  Id. at 23-24.

### A.   Summary of the Record

#### 1.   Medical/Mental Health Treatment Record[4]

Plaintiff was born on November 24, 1978, making him 37 years old on his alleged disability onset date (September 1, 2016), and 39 years old on his date last insured for

---

[4]Plaintiff's claims focus on his mental health impairments, and I limit my review of the record accordingly.

purposes of DIB (September 30, 2018).  Tr. at 39, 185.  Plaintiff completed college and

has taken additional classes in editing, proofreading, and grant writing.  Id. at 39-40, 226.

Prior to his alleged onset date, he worked in a co-working space for writers as a general

office manager, cleaning coffee cups, keeping the printers working, and sweeping the

floor.  Id. at 41-43.  He stopped working there when his father sold the business.  Id. at

43.[5]

The record establishes that Plaintiff has a history of bipolar I disorder with

psychotic features, obsessive-compulsive disorder, and symptoms of PTSD for which he

sought treatment when he was 14 and for which he was hospitalized in 1995 and 2008.

Tr. at 331-33, 342-45, 346, 348.  Plaintiff began treatment with Steven Zavodnick, M.D.,

on October 10, 2017, id. at 350-53, and continued monthly treatment until June 25, 2019,

when Plaintiff moved to upstate New York.[6]  Id. at 354-61.  During this period, Dr.

Zavodnick prescribed Abilify, Lithium, Lamictal, Xanax, Haldol, trazodone, Geodon,

temazepam, Vraylar, and Cogentin,[7] changing the combinations and dosages at each visit.

---

[5]After his alleged onset date, Plaintiff assisted his mother in editing publications, worked at an animal refuge as a kennel attendant, and was self-employed as a copy editor editing resumes and books by people he knew.  Id. at 40-41.  The ALJ found that these jobs did not amount to substantial gainful activity.  Id. at 19, 51.

[6]Plaintiff saw Dr. Zavodnick once a month, with additional visits in March, April, and May 2018, for medication adjustments.  Tr. at 354 (12/6/17, 1/5/18), 355 (2/6/18, 3/6/18, 3/13/18, 4/3/18), 356 (4/11/18, 4/18/18, 5/1/18), 357 (5/22/18, 6/19/18, 7/11/18, 8/15/18), 358 (9/19/18, 10/17/18, 11/14/18, 12/12/18), 359 (1/23/19[9], 2/27/19, 3/26/19), 360 (5/1/19, 6/4/19), 361 (6/25/19).

[7]Abilify is an antipsychotic medication used to treat schizophrenia and bipolar I disorder.  See https://www.drugs.com/abilify.html (last visited Sept. 7, 2022).  Lithium is a mood stabilizer used to treat or control the manic episodes of bipolar disorder.  See https://www.drugs.com/lithium.html (last visited Sept. 7, 2022).  Lamictal is an

Id.  Plaintiff continued treating with Dr. Zavodnick after his relocation to New York and the treatment notes indicate the doctor saw Plaintiff again in March and June 2020.  Id. at 390, 392.

Dr. Zavodnick's treatment notes are primarily dedicated to Plaintiff's reactions to changes in his medications, but also include observations on Plaintiff's symptoms.  In November 2017, the doctor noted that Plaintiff did not have any recent psychiatric symptoms, tr. at 354, and had a "very positive response to Abilify" in December 2017.  Id.  In January and February 2018, Plaintiff complained of insomnia, resulting in medication changes to Vraylar, Geoden, and finally to Risperdal.[8]  Id. at 354-55.  When he broke up with his girlfriend in April 2018, he reported feeling unsupported, unsafe, and under scrutiny.  Id. at 356.  With a change in medication the doctor noted that Plaintiff felt "less paranoid, less terrified," but other symptoms, including ideas of

_____

anticonvulsant used to delay mood episodes in bipolar disorder.  See https://www.drugs.com/lamictal.html (last visited Sept. 7, 2022).  Xanax is a benzodiazepine used to treat anxiety disorders and anxiety caused by depression.  See https://www.drugs.com/xanax.html (last visited Sept. 7, 2022).  Haldol is an antipsychotic used to treat schizophrenia.  See https://www.drugs.com/mtm/haldol.html (last visited Sept. 7, 2022).  Trazodone is an antidepressant used to decrease anxiety and insomnia related to depression.  See https://www.drugs.com/trazodone.html (last visited Sept. 7, 2022).  Geodon is an antipsychotic used to treat schizophrenia and the manic symptoms of bipolar disorder.  See https://www.drugs.com/geodon.html (last visited Sept. 7, 2022).  Temazepam (brand name Restoril) is a benzodiazepine used short term to treat insomnia.  See https://www.drugs.com/temazepam.html (last visited Sept. 7, 2022).  Vraylar is an antipsychotic used to treat schizophrenia and manic or mixed episodes of bipolar I disorder.  See https://www.drugs.com/vraylar.html (last visited Sept. 7, 2022).  Cogentin is used with other medications to treat symptoms of Parkinson's disease.  See https://www.drugs.com/mtm/cogentin.html (last visited Sept. 7, 2022).

[8]Risperdal is an antipsychotic used to treat schizophrenia and symptoms of bipolar disorder.  See https://www.drugs.com/risperdal.html (last visited Sept. 23, 2022).

influence, persisted.  Id.  In July 2018, Plaintiff reported an absence of psychiatric symptoms for ten days.  Id.  at 357.  In August, Plaintiff reported an absence of hallucinations and decrease in paranoid ideation.  Id.  Plaintiff developed symptoms again in September that was believed to be related to an extreme diet, which subsided in October 2018.  Id. at 358.  Dr. Zavodnick's plan was to reduce Plaintiff's use of Haldol because it appeared to temporarily increase his psychiatric symptoms, while maintaining his dose of Ability.  Id.  at 358-59, 389.  The notes following Plaintiff's move to upstate New York indicate that when Plaintiff next saw Dr. Zavodnick in March 2020, Plaintiff had not taken Haldol for 63 days and his mother noted that "he is markedly clearer, more present."  Id. at 390.  Although he had some hallucinations, they had subsided.  Id.  In June 2020, the doctor noted that Plaintiff's symptoms were tolerable.  Id.  at 392.

On June 25, 2019, Plaintiff began treatment at Riggs Psychology with Shanah Segal, Psy.D., because Plaintiff was seeking to learn new skills and coping strategies to handle his symptoms as he was reducing his medications.  Tr. at 363.  Dr. Segal diagnosed Plaintiff with unspecified bipolar and related disorder and initiated cognitive behavioral therapy for psychosis.  Id. at 363, 365.  Throughout his treatment with Dr. Segal, Plaintiff had primarily normal mental status examination, with no reports of any perceptual abnormalities.  Id. at 365 (7/9/19), 367 (7/16/19), 368 (7/23/19), 369 (7/30/19), 370 (8/6/19), 371 (8/13/19), 372 (8/21/19), 373 (8/27/19), 374 (9/3/19), 375

(9/12/19).[9]  Plaintiff terminated his cognitive behavioral therapy sessions with Dr. Segal on September 12, 2019, and the doctor noted that Plaintiff "made some progress towards his goals of less isolation[,] . . . seemed clinically stable and denied symptoms of depression, anxiety, mania, and psychosis."  Id. at 376.

On July 10, 2020, Dr. Zavodnick completed a Mental Medical Source Statement regarding Plaintiff's abilities prior to his date last insured, noting Plaintiff's diagnosis of bipolar disorder with psychotic features.  Tr. at 394.  The doctor stated that Plaintiff frequently experiences paranoia, "feeling that others on [the] street [are] taking special notice of him, staring at him, [and] have hostile or unwanted intent towards him."  Id. at 394.  At that time, Plaintiff was prescribed Abilify, Restoril, and Synthroid.[10]  Id.  Dr. Zavodnick noted that Plaintiff had a partial response to medication stabilization, but that Plaintiff was "emotionally fragile [and] has chosen to isolate himself in [a] rural setting with little or no social contact lest he decompensate into paranoia, hallucinations."  Id.

On the portion of the form addressing Plaintiff's mental abilities,[11] Dr. Zavodnick indicated that Plaintiff's abilities to accept instruction and respond appropriately to

---

[9]Dr. Segal noted some fatigue, a down and stressed mood, and decreased sleep on July 23, id. at 368, frustrated mood on July 30, id. at 369, and decreased sleep on August 13, 2019.  Id. at 371.

[10]Synthroid is a thyroid medication that replaces a hormone normally produced by the thyroid gland to regulate the body's energy and metabolism.  See https://www.drugs.com/synthroid.html (last visited Sept. 7, 2022).

[11]The form had a five-point system:  (1) unlimited or very good, (2) limited but satisfactory, (3) seriously limited, but not precluded meaning the "ability to function in this area is seriously limited and less than satisfactory, but not precluded in all circumstances," (4) unable to meet competitive standards meaning the patient "cannot satisfactorily perform the activity independently, appropriately, effectively, and on a

criticism from supervisors and deal with normal work stress were seriously limited; that Plaintiff was unable to meet competitive standards with respect to the abilities to maintain regular attendance and be punctual, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, get along with co-workers or peers without distracting them; and Plaintiff had no useful ability to work in coordination with or proximity to others without being distracted.  Tr. at 396.  The doctor also found that Plaintiff was unable to meet competitive standards with respect to setting realistic goals or making plans independently of others, dealing with stress of semiskilled work, interacting appropriately with the general public and maintaining socially appropriate behavior.  Id. at 397.  The doctor noted that "suspiciousness and paranoia severely limit [Plaintiff's] ability to interact with supervisors, coworkers, [and the] general public.  [He e]asily decompensates even in a neutral setting [and a]voids all social contact."  Id.[12] Finally, Dr. Zavodnick opined that Plaintiff would miss more than four days per month due to his impairments and treatment.  Id. at 398.

---

sustained basis in a regular work setting, and (5) no useful ability to function meaning the patient "cannot perform this activity in a regular work setting."  Tr. at 396.

[12]In both the initial and reconsideration level reviews, the reviewing doctors found that there was insufficient evidence, even with Dr. Zavodnick's records, to assess claimant's psychiatric functioning before his date last insured.  Tr. at 72 (Karen Weitzner, Ph.D., on July 10, 2019), 80-81 (Thomas Fink, Ph.D., on October 22, 2019).  I note that both of these reviews took place before Dr. Zavodnick completed his Medical Source Statement.

2.     <u>Testimony</u>

At the administrative hearing, Plaintiff explained that he could not work due to hallucinations.  <u>Tr.</u> at 43.  Plaintiff believed he had supernatural powers and could hear people's thoughts, causing him to isolate himself, <u>id.</u> at 44, and he testified that the medication did not help much.  <u>Id.</u> at 45.  Although he reported this to the doctor who adjusted  his dosages several times, Plaintiff explained that he eventually was taken off Haldol and the hallucinations ceased in March of 2020.  <u>Id.</u> at 45.  Plaintiff now lives in rural upstate New York, where he is isolated but sees his landlady and father.  <u>Id.</u> at 47.[13]

Plaintiff's mother completed a Function Report on June 5, 2019, prior to Plaintiff's move to upstate New York, describing Plaintiff's limitations.  <u>Tr.</u> at 279-86.  At that time, Plaintiff was living alone in an apartment and his mother indicated that he had no limitations with respect to personal care, could cook one-course meals and occasionally went to a diner, did laundry and cleaning, and was able to pay his bills and use a checkbook.   <u>Id.</u> at 280-82.  However, she noted he suffered from social impairments and described him as a "fearful recluse."  <u>Id.</u> at 284.

> My son is limited in his ability to go out in public and be with strangers.  This makes it difficult for him to work in retail and office settings.  He is anxious and sometimes paranoid.  The stresses he encounters in the street sometimes induce psychosis.

<u>Id.</u> at 279.

---

[13]Plaintiff's father, near whom Plaintiff resides in New York, was also available to testify at the hearing, but the ALJ said that because it was only corroborative, she did not need to hear his testimony.  <u>Tr.</u> at 48.  Based on Dr. Zavodnick's notes, Plaintiff moved to upstate New York after June 25, 2019, <u>id.</u> at 361, nine months after his insured status expired.

The VE who testified at the hearing characterized Plaintiff's prior work as that of a general clerk, an entry level, semiskilled, light job.  Tr. at 51.  The ALJ asked the VE a series of hypothetical questions, and the relevant question for these purposes posited a person of Plaintiff's age, education, and vocational background, who had no exertional limitations, with the ability to perform detailed, unskilled, uninvolved work-related activities, with less than occasional contact with the public and occasional contact with coworkers and supervisors, who does not require direct supervision, with few changes in the routine work setting, with low stress where there is no strict production pace requirements or quotas could perform work.  Id. at 53-55, 61-62.  The VE testified that such an individual could perform Plaintiff's past relevant work as he performed the work and could also perform the jobs of cleaner/housekeeper for offices cleaned after working hours, ticketer, and cleaner II.  Id. at 55-57.[14]

### B.   **Plaintiff's Claims**

Plaintiff claims that the ALJ (1) rejected the opinion of the treating psychiatrist for erroneous reasons, (2) erred in finding that Plaintiff's impairments did not meet the Listings, (3) erred by failing to incorporate all of Plaintiff's credibly established limitations in the RFC assessment, and (4) erred in finding Plaintiff was able to return to his past relevant work based on the ALJ's RFC finding, and also that (5) Plaintiff was deprived of a valid administrative adjudicatory process because the Commissioner under whom the ALJ issued the final decision served a longer term than constitutionally

---

[14]As will be discussed, the VE's testimony is ambiguous regarding Plaintiff's ability to perform his past relevant work.  See infra at 20-21.

permissible.  Docs. 10 & 18.[15]  Defendant responds that the ALJ's decision is supported

by substantial evidence and the separation of powers argument does not entitle him to

remand.  Doc. 16.

        1.    Dr. Zavodnick's Opinion

Several of Plaintiff's claims are related to or hinge on the ALJ's consideration of

Dr. Zavodnick's Medical Source Statement.  As previously noted, Dr. Zavodnick opined

that in many areas of functioning Plaintiff's abilities were seriously limited, he was

unable to meet competitive standards, or he had no useful ability.  See supra at 8-9.

When asked about these limitations, the VE testified that such limitations would preclude

work, specifically noting that absenteeism exceeding one day per month would preclude

all work.  Tr. at 58-59.

The new regulations governing the consideration of opinion evidence, which apply

to Plaintiff's claim because it was filed after March 27, 2017, focus on the persuasiveness

of each medical opinion.

> We will not defer or give any specific evidentiary weight,
> including controlling weight, to any medical opinion(s) or
> prior administrative medical finding(s), including those from
> your medical sources.

20 C.F.R. § 404.1520c(a).[16]  The regulations list the factors to be utilized in considering

medical opinions:  supportability, consistency, treatment relationship including the length

---

[15]I have reordered the claims for ease of discussion.

[16]In contrast, the regulations governing prior applications spoke in terms of the
weight to be given each opinion, including controlling weight for the opinions of certain
treating sources.  20 C.F.R. § 404.1527.

and purpose of the treatment and frequency of examinations, specialization, and other factors including familiarity with other evidence in the record or an understanding of the disability program.  Id. § 404.1520c(c).  The most important of these factors are supportability and consistency, and the regulations require the ALJ to explain these factors, but do not require discussion of the others.  Id. § 404.1520c(b)(2).  The regulations explain that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be."  Id. § 404.1520c(c)(1).  In addition, "[t]he more consistent a medical opinion(s) . . .  is with the evidence from other medical sources and nonmedical sources . . . , the more persuasive the medical opinion(s) . . . will be."  Id. § 404.1520c(c)(2).

"The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects."  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Stewart v. Sec'y HEW, 714 F.2d 287, 290 (3d Cir. 1983)).  When there is a conflict in the evidence, the ALJ may choose which evidence to credit and which evidence not to credit, so long as she does not "reject evidence for no reason or for the wrong reason." Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005); see also Plummer, 186 F.3d at 429 (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).

The ALJ found that Dr. Zavodnick's opinion was "not persuasive as it is not supported by the record."  Tr. at 23 (citing id. at 394-98).  Plaintiff complains that this statement is "so vague as to make meaningful review difficult, if not impossible; it is also erroneous."  Doc. 10 at 10.  Plaintiff argues that Dr. Zavodnick "provided objective

medical evidence of his clinical findings and supporting explanations for his opinion,"

and complains that the ALJ did not address consistency, the other factor which she is

required by the regulations to address.  Id. at 10-12; Doc. 18 at 2-4.

Contrary to Plaintiff's assertions, the ALJ's consideration of Dr. Zavodnick's

assessment was not limited to the quoted conclusory statement.  Earlier in her decision,

the ALJ did address both supportability and consistency.

> During the adjudicatory period, [Plaintiff] had not had an
> i[n]patient psychiatric hospitalization, partial hospitalization,
> been admitted to a day program, nor been admitted to an
> emergency room.  His treatment had been conservative in
> nature, consisting . . . primarily of psychotropic medication.
> There are no treatment records from the alleged onset date
> until October 2017.  There is no evidence in the record of
> [Plaintiff] having any ongoing significant mental health
> symptoms from October 2017 through September 2018 (see
> Dr. Zavodnick's office notes [tr. at 350-62, 378-90]).  Dr.
> Segal's mental status examination was within normal limits
> ([Id. at 365]).  He admitted, in his testimony, that, with
> changes in his medications, he has not had a hallucination
> since March 2020.  Dr. Zavodnick reported, in an office note
> dated June 3, 2020, that [Plaintiff's] symptoms were tolerable
> . . . as he tapered his dosage of Abilify ([id. at 392]).  There
> is no evidence in the record that he had experienced any
> significant side effects of medication.  Despite alleging a
> debilitated lifestyle, [Plaintiff] has been able to live alone,
> take care of his personal needs without assistance, and do
> household chores, including cooking, cleaning, sweeping, and
> laundry.  He has been able to go out unaccompanied, shop by
> computer for groceries and take-out food, and manage his
> own finances.  He has been able to read, write fiction, do
> internet research, interact with family members and friends,
> and go out to a diner with his mother (Testimony and [id. at

259-69, 279-87]).  Dr. Zavodnick noted that [Plaintiff] was
writing and editing ([id. at 392]).

Tr. at 22-23.[17]

Thus, the ALJ noted that, contrary to the limitations noted in his Medical Source
Statement, Dr. Zavodnick's office notes do not indicate ongoing significant mental health
symptoms.  The doctor's opinion was not consistent with Plaintiff's lack of treatment for
over a year from his alleged onset date, Dr. Segal's normal mental status examinations,
and Plaintiff's activities.  I therefore conclude that substantial evidence supports the
ALJ's assessment of Dr. Zavodnick's opinions.[18]

2.    Listing 12.04

Plaintiff's argument regarding the ALJ's consideration of Listing 12.04 is related
to the ALJ's consideration of Dr. Zavodnick's opinion.  Plaintiff contends that the ALJ
erred in concluding that he had only moderate limitation in the Paragraph B criteria and
did not meet the C criteria of Listing 12.04.  Doc. 10 at 15-17.[19]

---

[17]This discussion of the evidence immediately preceded the ALJ's discussion of
Dr. Zavodnick's opinion, and is properly part of this court's review because the court is
required to consider the ALJ's decision "as a whole."  Jones v. Barnhart, 364 F.3d 501,
505 (3d Cir. 2004).

[18]Plaintiff also argues that Dr. Zavodnick's opinion should have been found more
persuasive based on his specialty and his treatment relationship with Plaintiff, Doc. 10 at
13-14, but acknowledges that the new regulations do not require the ALJ to explain how
she considered these factors.  Id. at 13 n.8.

[19]Listing 12.04, which addresses depressive, bipolar and related disorders, can be
satisfied by meeting the A and B or A and C criteria.  20 C.F.R. Pt. 404, Subpt. P, App. 1
§ 12.04.  At issue here are the B and C criteria.  To meet the B criteria, a claimant must
have extreme limitation in one or marked limitation in two of the areas of mental
functioning:  (1) understand, remember, or apply information, (2) interact with others, (3)
concentrate, persist, or maintain pace, and (4) adapt or manage oneself.  Id. § 12.04(B).

15

With respect to the B criteria of Listing 12.04, Plaintiff contends that the evidence demonstrates that he has marked limitations in three of the four areas of functioning -- (1) interaction with others, (2) concentration, persistence and maintaining pace, and (3) adapting and managing oneself -- based on his own testimony, the report of his mother, and Dr. Zavodnick's assessment.  Doc. 10 at 14-15.[20]  Defendant responds that the ALJ's determination in this regard is supported by substantial evidence as "the ALJ pointed to the evidence that Plaintiff could perform household chores such as cooking, cleaning, sweeping, and cleaning laundry; went out alone; used the computer to shop for groceries and take-out food; and managed his own finances," as well as the fact that Plaintiff "read, wrote fiction, conducted internet research, interacted with family members and friends, and went out to a diner with his mother."  Doc. 16 at 24.

The ALJ's determination with respect to these areas of mental functioning is supported by substantial evidence.  To the extent Plaintiff relies on the limitations contained in Dr. Zavodnick's assessment, I have already determined that the ALJ properly considered the assessment and found that it was not persuasive.  See supra at 13-

---

A moderate limitation means that "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair," id. § 12.00(F)(2)(c), while a marked limitation means that such functioning is "seriously limited."  Id. § 12.00(F)(2)(d).  The C criteria requires a claimant to have a serious and persistent mental disorder lasting at least two years with evidence of ongoing mental health therapy, and minimal capacity to adapt to changes in his or her environment or to demands that are not already part of his or her daily life.  Id. § 12.04(C).

[20]Because Plaintiff's argument is limited to these three areas of mental functioning, Doc. 10 at 16, I will not address the fourth area – understand, remember, or apply information.

15.  Other evidence in the record supports the ALJ's determination with respect to each category.  The mental ability to concentrate, persist, and maintain pace "refers to the abilities to focus attention on work activities and stay on task at a sustained rate."  20 C.F.R. Pt. 404, Subpt. P. App. 1 § 12.00(E)(3).  Here, the evidence establishes that Plaintiff worked as an editor during the relevant period, cooked and did laundry, went to the diner regularly, shopped via the computer, and managed his own finances including a checkbook.  Tr. at 40-41, 49, 281-82, 354.  The ALJ's determination of moderate limitation in this area is supported by the record.

The mental ability to adapt and manage oneself "refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting."  20 C.F.R. 404, Subpt. P, App. 1 § 12.00(E)(4).  During the relevant period, Plaintiff lived by himself, took care of his personal needs, did household chores and managed his finances.  Tr. at 46, 279-82.  He also volunteered and worked at an animal shelter caring for dogs and cleaning cages.  Id. at 41, 280.  Thus, the ALJ's determination of a moderate limitation in this area is supported by the record.

Finally, interacting with others "refers to the abilities to relate to and work with supervisors, co-workers, and the public."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E)(2).  In support of the finding that Plaintiff had a moderate limitation in this area, the ALJ found that Plaintiff was "able to interact adequately with family members and friends."  Tr. at 20.  During the relevant period, although Dr. Zavodnick's notes indicate that Plaintiff suffered from distinct periods of hallucinations, ideas of influence/thought broadcasts, and delusions, they were short-lived.  Id. at 385 (noting

17

ideas of influence/delusions of control in April 2018), 386 (absence of hallucinations and reduced paranoid ideation on August 15, 2018), 387 (notation that Plaintiff developed psychotic symptoms on diet on September 19, 2018, and had delusions for two weeks on October 17, 2018).  In addition, during the relevant time, Plaintiff did freelance editing work and worked/volunteered at an animal shelter.  Id. at 40-41, 226, 280.  Dr. Zavodnick also indicated that during the relevant period Plaintiff was dating, had job interviews, and had a girlfriend, with whom he broke up in April 2018.  Id. at 383-85. Thus, the finding of moderate limitation in this area is supported by substantial evidence.[21]

Plaintiff also argues that he meets the C criteria of Listing 12.04, which requires a "serious and persistent" mental disorder with ongoing mental health therapy, and "minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04(C).  Plaintiff complains that the ALJ's "boilerplate finding" that Plaintiff did not establish the C criteria is not supported by the evidence.  Doc. 10 at 17.

Although the ALJ's discussion of the C criteria was cursory in that section of her opinion, tr. at 20, the ALJ conducted a thorough analysis of the evidence as previously quoted.  See supra at 13-15.  The same record evidence that did not support the limitations in Dr. Zavodnick's Medical Source Statement -- the lack of treatment for a

---

[21]Even if, as Plaintiff argues, he had a marked limitation in this area of functioning, to meet the B criteria of the Listing 12.04, he would have to establish a marked limitation in at least two of the areas of functioning, which he has failed to do as discussed previously.

year from his alleged onset date, Dr. Zavodnick's notes, Plaintiff's activities during the relevant period, and Dr. Segal's normal mental status examinations -- also does not support a finding that Plaintiff meets the C criteria of Listing 12.04. See Jones, 364 F.3d at 505 (requiring review of the ALJ's decision as a whole).[22]

### 3.   VE Testimony - RFC Assessment

Again, relying on Dr. Zavodnick's Medical Source Statement, Plaintiff argues that the ALJ erred by failing to incorporate all of Plaintiff's credibly established limitations in her hypothetical question to the VE. Doc. 10 at 20-21. In order for a VE's testimony to constitute substantial evidence, the hypothetical question posed must consider all of the claimant's impairments which are supported by the record. Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1997) (citing Podedworny v. Harris, 745 F.2d 210 (3d Cir. 1984)). However, for the reasons previously stated, see supra at 13-15, I conclude that the ALJ did not err with respect to her consideration of Dr. Zavodnick's assessment. Thus, the failure to include those limitations was not error.

---

[22]Plaintiff also complains that the ALJ erred in failing to address his request that the ALJ obtain evidence from a Medical Expert. Doc. 10 at 17 n.11. The ALJ was not required to enlist the assistance of a Medical Expert. See Social Security Ruling ("SSR") 18-1p, "Titles II and XVI:  Determining the Established Onset Date in Disability Claims, https://www.ssa.gov/OP_Home/rulings/di/01/SSR2018-01-di-01.html (last visited Sept. 14, 2022) ("if the ALJ needs to infer the date that the claimant first met the statutory definition of disability, he or she may call on the services of an ME by soliciting or requesting the services of an ME. . . .  The decision to call on the services of an ME is always at the ALJ's discretion."). Because the ALJ was able to make an informed judgment on the basis of the record before her regarding disability in this case and did not need to infer an onset date, there was no need for a Medical Expert.

4.      VE Testimony - Past Relevant Work

Plaintiff next complains that the ALJ erred in determining that Plaintiff could perform his past relevant work as a general clerk.  Doc. 10 at 17-20.  Plaintiff's argument focuses on the SVP level of his general clerk position.  SVP levels measure the skill level necessary to perform a particular job.  Zirnsak, 777 F.2d at 616 (citing SSR 00-4p, "Policy Interpretation Ruling:  Titles II and XVI:  Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions," 2000 WL 1898704, at *3 (Dec. 4, 2000)).  "SVP levels in the [Dictionary of Occupational Titles ("DOT")] range from level 1 to level 9" and "[t]he DOT skill levels correspond with the . . . [Code of Federal Regulations ("CFR")]."  Id. (citing SSR 00-4p).  The CFR categorizes occupations into three classes: "unskilled, semi-skilled, and skilled."  20 C.F.R § 404.1568(a)-(c).  "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time," while "[s]emi-skilled work is work which needs some skills but does not require doing the more complex work duties," and "[s]killed work requires qualifications in which a person uses judgment to determine the machine and manual operations to be performed in order to obtain the proper form, quality, or quantity of material to be produced."  Id. § 404.1568(a), (b), (c).  "[U]nskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  SSR 00-4p, 2000 WL 1898704, at *3.

Here, the VE identified Plaintiff's past work as that of a general clerk, which under the DOT is semiskilled with an SVP of 3.  Tr. at 51.  After the VE indicated that

20

Plaintiff could not perform the job described in the ALJ's first hypothetical (no limit on

interaction with supervisors and less than occasional contact with public and coworkers),

id. at 52, the ALJ changed the hypothetical with respect to the level of interaction with

coworkers and clarified the interaction with supervisors.  Id. at 53-55.  Focusing on the

change in level of interaction, the ALJ asked if Plaintiff could perform his past relevant

work.

> Q  . . . I just want to be clear that for this hypo #2 where the
> requirement changed to occasional interaction with the
> coworkers and less than occasional with the public, with that
> change could the individual perform the past work?
> A  As performed, yes, Your Honor.

Id. at 55.  Plaintiff argues that this testimony, and the ALJ's conclusion that Plaintiff

could return to his past work, is inconsistent with the ALJ's RFC finding, id. at 21, which

included a limitation to work at SVP levels 1-2.  Doc. 10 at 20.

Defendant relies on the quoted testimony to argue that substantial evidence

supports the ALJ's determination that Plaintiff could perform his past relevant work as he

performed it.  Doc. 16 at 28.  However, because of how the ALJ asked the question, it is

not clear that the VE was speaking in terms of all of the requirements of Plaintiff's past

job, including the SVP, or just the interaction components of the hypothetical.  Although

the VE identified that the clerk position as generally performed was an SVP 3, the VE

never identified what the SVP of the job was as Plaintiff performed it, and in the context

of the questioning it is not clear that the VE had considered that in her response.

Nevertheless, this ambiguity does not require remand.  The VE identified other

jobs that Plaintiff could perform at the SVP 1 or 2 level – cleaner/housekeeping (SVP 2),

cleaner II (SVP 1), and ticketer (SVP 2).  Tr. at 55-56.  Thus, the error at the fourth step

of the sequential evaluation is harmless because substantial evidence supports that there

was other work in the economy which Plaintiff could perform.

        5.     Challenge to the Appointment of the Commissioner of Social
              Security

Relying on Seila Law LLC v. Consumer Financial Protection Bureau, 140 S.Ct.

2183 (2020), Plaintiff argues that the unconstitutional structure of the Social Security

Administration deprived Plaintiff of a valid administrative adjudicatory process.  Doc. 10

at 4-6; Doc. 18 at 10-18.  Although Defendant agrees that the statute governing the

appointment of the Commissioner of Social Security violates the separation of powers,

she maintains that this does not support setting aside the decision of the ALJ in this case.

Doc. 16 at 5-16.

In Seila Law, the Supreme Court examined the authority of the Director of the

Consumer Financial Protection Bureau ("CFPB") in the context of Article II of the

Constitution vesting executive power in the President.  140 S. Ct. at 2197.  The Court

held that "the CFPB's leadership by a single individual removable only for inefficiency,

neglect, or malfeasance violates the separation of powers."  Id.  The Court described the

structure of the CFPB as "an independent agency led by a single Director and vested with

significant executive power," and concluded that the lack of presidential authority to

remove such an officer at will had "no basis in history and no place in our constitutional

structure."  Id. at 2201.

The Court compared the CFPB to other agencies, including the Social Security Administration, and found important differences.

> After years of litigating the agency's constitutionality, the Courts of Appeals, parties, and *amici* have identified "only a handful of isolated" incidents in which Congress has provided good-cause tenure to principal officers who wield power alone rather than as members of a board or commission.  "[T]hese few scattered examples" – four to be exact – shed little light . . . .
>          . . . .
>          Third, the CFBP's defenders note that the Social Security Administration (SSA) has been run by a single Administrator since 1994.  That example, too, is comparatively recent and controversial.  President Clinton questioned the constitutionality of the SSA's new single-Director structure upon signing it into law.  In addition, unlike the CFPB, the SSA lacks the authority to bring enforcement actions against private parties.  Its role is largely limited to adjudicating claims for Social Security benefits.
>          . . . .
>          . . . [T]hese isolated examples are modern and contested.  And they do not involve regulatory or enforcement authority remotely comparable to that exercised by the CFPB.  The CFPB's single-Director structure is an innovation with no foothold in history or tradition.

140 S. Ct. at 2202 (internal citations omitted).  Thus, in finding a separation of powers violation in the for-cause restriction on removal of the Director of the CFPB, the Court distinguished the SSA from the CFPB.

Moreover, after determining that "the CFPB's leadership by a single independent Director violates the separation of powers," the Court in Seila Law addressed the remedy for the constitutional violation.  140 S. Ct. at 2207-08.  At issue was the enforceability of the CFPB's civil investigative demand issued to a law firm.  Rather than simply dismissing the agency's enforcement action, the Court determined that "the removal

provision can be severed from the other statutory provisions relating to the CFPB's powers and responsibilities," id. at 2209, noting that "[w]e think it clear that Congress would prefer that we use a scalpel rather than a bulldozer in curing the constitutional defect we identify today." Id. at 2210-11.  The Court remanded the matter for a determination whether the civil investigative demand was validly ratified.  Id. at 2211.

Here, Defendant agrees that the provision limiting the President's authority to remove the Commissioner of Social Security without good cause violates the separation of powers, Doc. 16 at 5, but here the parties' agreement ends.  Plaintiff contends that because the Commissioner delegates authority to ALJ's to hear and decide cases pursuant to regulations promulgated by an unconstitutionally appointed Commissioner, the administrative decision is constitutionally defective.  Doc. 10 at 5-6.  Defendant argues that the appointment of the ALJ who decided this case was ratified by an Acting Commissioner, removeable at will, and that Plaintiff has not and cannot show that the removal restriction caused the denial of his claim.  Doc. 16 at 5.[23]

My colleague, the late Honorable Marilyn Heffley, addressed Seila Law's applicability in the Social Security appeals context.  See Wicker v. Kijakazi, Civ. No. 20-

---

[23]It is unclear when the ALJ in this case was appointed, and by whom.  Plaintiff argues that the ALJ's decision (and the Appeals Council's decision) occurred when the Commissioner was Andrew Saul, whose appointment is allegedly unconstitutional.  Doc. 10 at 5; Doc. 18 at 10 n.6.  Defendant states that the ALJ's appointment was ratified by an Acting Commissioner whose appointment did not violate the separation of powers. Doc. 16 at 7 n.3.  I need not delve into the ALJ's appointment in this case because Plaintiff's challenge to the ALJ's authority is based upon the validity of the Commissioner's appointment in light of the unconstitutional removal protection.  Doc. 10 at 4-5; Doc. 18 at 11-12.

4771, 2022 WL 267896 at *8-10 (E.D. Pa. Jan. 28, 2022).  After reviewing several such cases from across the country, Judge Heffley observed that the district courts have relied on another recent Supreme Court case in rejecting the separation of powers argument in Social Security appeals.  Id. at *9 (citing Collins v. Yellen, 141 S. Ct. 1761 (2021)). Collins involved the for-cause removal restriction for the single director of the Federal Housing Finance Agency ("FHFA"), which the Supreme Court found violated the separation of powers.  The Court instructed that "whenever a separation-of-powers violation occurs, any aggrieved party *with standing* may file a constitutional challenge." 141 S. Ct. at 1780 (emphasis added).  To establish standing, "a plaintiff must show that it has suffered 'an injury in fact' that is 'fairly traceable' to the defendant's conduct and would likely be 'redressed by a favorable decision.'"  Id. at 1779 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  "[F]or purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to 'allegedly unlawful conduct' of the defendant, not to the provision of law that is challenged."  Id. (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)).[24]

Judge Heffley next explained the application of Collins to a Social Security benefits review case, relying on a case arising out of the Western District of Washington.

In Collins, the Directors of the FHFA adopted an
amendment . . . to certain financial agreements that

---

[24]In Seila Law, the Supreme Court "found it sufficient that the challenger sustain[ed] injury from an executive act that allegedly exceeds the official's authority." 140 S.Ct. at 2196.  In Collins, the Supreme Court held that the traceability requirement was satisfied because the shareholders suffered a "pocketbook injury" directly traceable to an amendment adopted by the directors of the FHFA that "materially changed the nature of their agreements."  141 S.Ct. at 1779.

25

"materially changed the nature of the agreements" and
resulted in the companies in which plaintiffs were
shareholders transferring to the U.S. Treasury "at least $124
billion dollars more than the companies would have had to
pay" under the prior form of the agreements.  The plaintiffs in
Collins thus had an identifiable basis to contend that but for
the unconstitutional removal provision, the President may
have removed and appointed a different Director who would
have disapproved of the adoption (or implementation) of the .
. . [a]mendment.

In contrast, there is nothing showing the
Commissioner or the SSA implemented new and relevant
agency action that may have turned upon the President's
inability to remove the Commissioner.  Plaintiff has not
identified any new regulations, agency policies or directives
Commissioner Saul installed that may have affected her
claims.  Plaintiff thus fails to show how or why [the unlawful]
removal clause possibly harmed her.

Wicker, 2022 WL 267896, at *10 (quoting Lisa Y. v. Comm'r of Soc. Sec., No. C21-

5207, 2021 WL 5177363, at *7 (W.D. Wash. Nov. 8, 2021) (internal citations omitted));

see also Kowalski v. Kijakazi, Civ. No. 20-1783, 2022 WL 526094, at *10-11 (M.D. Pa.

Feb. 22, 2022) (requiring nexus between removal restriction and denial of application for

disability benefits); Mor v. Kijakazi, Civ. No. 21-1730, 2022 WL 73510, at *5 (D.N.J.

Jan. 7, 2022) (same).

Here, Plaintiff does not identify any traceable injury linked to the allegedly

unconstitutional removal clause.  Rather, he argues that he has satisfied this nexus

because the decision denying benefits was made by an unconstitutionally appointed

Commissioner.  Doc. 10 at 5-6; Doc. 18 at 11-12.  Like Judge Heffley, I do not find this

sufficient to establish his standing.  "Instead of merely tracing her injury – the denial of

disability benefits – to Commissioner Saul's ability to delegate power to ALJs and the

26

Appeals Council in general, . . .  [Plaintiff's] burden is higher:  she must be able to trace

that injury to the actual unconstitutional removal clause, which is the unlawful conduct in

this matter."  <u>Wicker</u>, 2022 WL 267896, at *10; <u>compare</u> <u>Collins</u>, 141 S. Ct. at 1779

("[F]or purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can

be traced to the 'allegedly unlawful conduct' of the defendant. . . .  Because the relevant

action in this case is the . . . amendment, and because the shareholders' concrete injury

flows directly from that amendment, the traceability requirement is satisfied."), <u>with</u>

<u>Wicker</u>, 2022 WL 267896, at *10 ("Commissioner Saul did not promulgate a new action

affecting or injuring Wicker . . . .  Commissioner Saul merely occupied the

Commissioner role . . . .  [T]he agency continued to function as it had [before <u>Seila Law</u>],

given that the removal clause was the only constitutional defect.").  Plaintiff has failed to

establish any nexus between the removal restriction and the denial of his application for

benefits.  Therefore, I reject Plaintiff's challenge to the ALJ's decision based on <u>Seila</u>

<u>Law</u>.

## IV.  **<u>CONCLUSION</u>**

The ALJ's disability determination is supported by substantial evidence.  The ALJ

properly considered the opinion evidence utilizing the new criteria and did not err in her

RFC determination.  Although her decision that Plaintiff could return to his past relevant

work is not supported by substantial evidence based on the ambiguity of the VE's

testimony, the error is harmless because the VE identified other work that Plaintiff could

perform at the fifth step of the evaluation that was unaffected by the ambiguity.  Finally,

Plaintiff is not entitled to remand based on his separation of powers claim regarding the appointment of the Commissioner.

An appropriate Order follows.